SIZES UNLIMITED, INC. and The
Avenue, Inc., Plaintiffs,

v.

SIZES TO FIT, INC., Defendant.

No. 92 CV 2443 ERK.

United States District Court,
E.D. New York.

Sept. 14, 1994.

Andrew L. Deutsch, Varet Marcus & Fink P.C., New York City, for plaintiffs.

Edgar H. Haug, Curtis, Morris & Safford, P.C., New York City, for defendant.

### CORRECTED MEMORANDUM AND ORDER

KORMAN, District Judge.

Plaintiffs Sizes Unlimited, Inc. and The Avenue, Inc. are clothing retailers specializing in the sale of large-size women's clothing under the names SIZES WOMAN, SIZES UNLIMITED and SMART SIZE, as well as THE AVENUE. They bring this action for injunctive relief against another retailer, Sizes to Fit, Inc., claiming that the use of the name SIZES TO FIT on defendant's store infringed plaintiffs' rights under the Lanham Act and the state law of unfair competition.

Plaintiffs initially sought a preliminary injunction. United States Magistrate Judge Joan M. Azrack entered a report recommending that plaintiffs request for a preliminary injunction be denied and plaintiffs filed objections to that report. Subsequently, plaintiffs withdrew their request for a preliminary injunction and agreed that the application for permanent injunctive relief would be heard on the record made in the preliminary injunction hearing and any additional evidence the parties wished to present. The factual findings of the United States Magistrate Judge are incorporated by reference here. These findings, along with the evidence presented by the parties in connection with the hearing on the permanent injunction, are summarized below to the extent relevant to the discussion of the issues.

Plaintiffs seek injunctive relief pursuant to § 43(a) of the Lanham Act. They contend that defendant's use of the name SIZES TO FIT for its large-size women's clothing store violates plaintiffs' rights in the name SIZES, which is not a registered trademark, but is nonetheless protectable under the provisions of the Lanham Act which makes it unlawful to use

> in connection with any goods or services, any word, term, name ... or any false designation of origin which—
>
> (1) is likely to cause confusion, or to cause mistake, or to deceive as to ... the origin, sponsorship or approval of his or her goods, services, or commercial activities ...

15 U.S.C. § 1125(a). *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992).

■ Raising a claim not made in the pleadings, plaintiffs also argue that defendant's use of SIZES TO FIT infringes its registered trademarks in the store names SIZES WOMAN and SMART SIZE from which, along with the unregistered SIZES UNLIMITED, the claimed unregistered SIZES mark derives. Plaintiffs assert that, under Fed.R.Civ.P. 15(b), an issue not raised by the pleadings will be treated as if it was raised if it was tried by express or implied consent of the parties. *Northern Oil Co. v. Socony Mobil Oil Co.*, 347 F.2d 81, 83–84 (2d Cir.1965).

■ The problem with the unpled registered trademark claims in the present case, however, is that they cannot be deemed to have been tried by the implied consent of the defendant. Because these claims were not raised in the pleadings, defendant had no opportunity to raise any objections or issues it might have with respect to the enforceability of these trademarks. *See, e.g., PaperCut-*

*ter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 563 (2d Cir.1990) (defendant may petition for cancellation of trademark as counterclaim in an infringement suit). Moreover, the parties have not fully tried or briefed the questions relating to the nature, enforceability or infringement of the registered marks. Accordingly, although it is questionable whether the additional issues would affect the outcome, the present analysis will center on the unregistered mark claimed by the plaintiffs in SIZES.[1]

■ The eligibility for and scope of protection under section 43(a) is dependent on the nature of mark alleged infringed. *Western Publishing Co., Inc. v. Rose Art Indus., Inc.,* 910 F.2d 57, 60 (2d Cir.1990). In order to be protectable, the mark must tend to identify the goods sold under that mark as emanating from a particular source. In this inquiry, marks are generally categorized along a spectrum of distinctiveness. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

In arguing for a preliminary injunction, plaintiffs initially took the position that their SIZES mark was descriptive, rather than generic. While the United States Magistrate Judge agreed with plaintiffs characterization of the mark as descriptive, she determined that plaintiffs could not show secondary meaning and that the mark was not protectable under Section 43(a). Plaintiffs have since retrenched. They now argue that the mark is suggestive and that they can prevail without a showing of secondary meaning.

■ The distinction between descriptive and suggestive marks is significant because descriptive marks are eligible for federal protection only if they have "become distinctive of the goods in commerce" by having developed what is known as "secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757. Consumers and potential consumers of a product must, on the basis of the mark at issue, associate the goods or services at issue with a single source, even if that source is anonymous. *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.,* 747 F.2d 81 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). In the absence of proof of secondary meaning, an unregistered descriptive mark is not protectable, and it is unnecessary to consider the remaining factors that would bear on the analysis of the likelihood of confusion. *Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 216 (2d Cir.1985).

■ By contrast, suggestive and arbitrary marks, namely, those which require "imagination, thought and perception to reach a conclusion as to the nature of the goods," *Abercrombie & Fitch,* 537 F.2d at 11, are protectable under § 43(a) without proof of secondary meaning, *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. at ——, 112 S.Ct. at 2757, although plaintiffs must still establish that defendant's use of the mark is likely to cause confusion as to the source of the goods carrying the disputed mark.

I agree with the United States Magistrate Judge that the mark in issue is descriptive and that, even if it is suggestive, plaintiffs have failed to satisfy their burden of showing that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." *McGregor–Doniger,*

---

**1.** Because the plaintiffs have only two registered marks, SIZES WOMAN and SMART SIZE, the gravamen of plaintiffs' claim of trademark infringement would have to be that its SIZES WOMAN mark is infringed, since that name is the only registered mark with "Sizes" positioned in the manner that plaintiffs seek to interdict. Thus, even assuming plaintiffs' SIZES WOMAN and SMART SIZE marks are fully enforceable, issues on which no evidence has been presented here, plaintiffs would have the burden of proving

the likelihood of confusion between that mark and defendant's SIZES TO FIT. *See, e.g., McGregor–Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1130 (2d Cir.1979). Because of the difference between the various marks and the relative weakness of plaintiffs' mark, and because any potential consumer confusion between the various stores is explained best by the shared descriptive use of the word "Sizes," they cannot meet this burden here.

*Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1130 (2d Cir.1979). Because there is little to add to her discussion of the latter issue, I address here the newly asserted argument that the mark is not descriptive.

### Discussion

■ The determination of the character of a mark is made in the context of its use by the party claiming rights in that mark. As explained time and again by the Court of Appeals for the Second Circuit "the focus in categorizing a mark is on how the words are used in context rather than their meaning in the abstract" *Bristol–Myers Squibb Co. v. McNeil–P.P.C.,* 973 F.2d 1033, 1041 (2d Cir. 1992). "[T]he word "apple" would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'To-mapple' for combination tomato-apple juice and generic when used on apples." *Id. citing* 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 11:22, at 498–99 (2d ed. 1984).

The principal issue presented here is whether, as argued by defendant, plaintiffs' use of the SIZES mark, in the context of a group of stores selling large size women's clothing, must be understood to be descriptive, rather than suggestive, because SIZES directly indicates the most important marketing feature of plaintiffs' merchandise, namely their size. Defendant therefore asserts that plaintiffs must make a showing of secondary meaning before they have established an interest in the mark which would entitle them to relief. Plaintiffs, on the other hand, contend that the mark is suggestive because SIZES does not directly describe large-size women's clothing, clothing generally, or refer to plaintiffs' stores or merchandising methods, and that no showing of secondary meaning is necessary.

■ A descriptive mark is one that "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Abercrombie & Fitch,* 537 F.2d at 11. A term can be descriptive in two ways. It can literally describe the product or it can describe the purpose or utility of the product. *20th Century Wear v. Sanmark–Stardust,* 747 F.2d at 88. As explained in *PaperCutter Inc. v. Fay's Drug Co.,* 900 F.2d at 563,

examples of descriptive terms include terms conveying the characteristics of the goods, services, or business, or indicating the purpose, functions, size, quantity, capacity or merits of a product.

■ A mark need not convey every piece of relevant information about the nature of a product in order to be descriptive. Rather, it need only "immediately convey[ ] an important attribute of plaintiffs' products." *Bristol–Myers,* 973 F.2d at 1041 (P.M. was descriptive mark for product to be used at night); *20th Century* (ENERGY–SAVERS was descriptive mark for warm pajamas; *Thompson Medical Co., Inc. v. Pfizer,* 753 F.2d 208, 216, n. 15 (2d Cir.1985) (SPORTSCREME was descriptive mark for analgesic product to be used in connection with sports activities, even though it was "inadequately descriptive" of actual properties or use of cream); *Scholastic, Inc. v. Macmillan, Inc.,* 650 F.Supp. 866, 871 (S.D.N.Y.1987) (CLASSROOM was descriptive mark for magazine for teachers and students) *cited with approval in Bernard v. Commerce Drug Co.,* 964 F.2d 1338, 1342 (2d Cir.1992). Moreover, even if a mark or portion of a mark is susceptible of more than one interpretation, it will be deemed descriptive if the intended denotation is common or unimaginative, so that "exclusive use of the term might unfairly monopolize common speech." *Bernard v. Commerce Drug Co.,* 964 F.2d at 1342.

No monopoly is possible of a mark that neither possessed a high capacity to convey indirect information at the outset, nor was used in such a way as to become an effective transmitter of such information, despite its limited potential in this respect.

S. Naresh, *Incontestability and Rights in Descriptive Trademarks,* 53 U.Chi.L.Rev. 953, 961–62 (1986).

■ These guideposts suggest that plaintiffs' use of SIZES is descriptive. As set out above, plaintiffs operate three chains of stores from which the term derives, SIZES WOMAN, SIZES UNLIMITED and SMART SIZE. All three chains carry women's large size or plus-size clothing exclusively, namely, sizes 14 and up. Plaintiffs, how-

ever, have no store called "Sizes." Rather, plaintiffs also use SIZES in a limited manner to refer to its own stores and product, in essence trying to create what is known as a "family" of marks. That use, however, as discussed in more detail below in connection with the issue of secondary meaning, is not extensive or heavily promoted. *Compare, e.g., McDonald's Corp. v. McBagel's Inc.,* 649 F.Supp. 1268, 1272 (S.D.N.Y.1986) (McDonald's had established family of marks for generic food products beginning with prefixes "Mc" and "Mac").

In the store names at issue, plaintiffs' mark refers to size as the defining characteristic of plaintiffs' products. "Sizes" in SIZES WOMAN, used to denominate a large-size women's clothing store, describes and refers to the single most important marketing feature of the goods at issue: their size. Similarly, "Sizes" in the name SIZES UNLIMITED indicates to the potential consumer, without any exertion of the imagination, that the store at issue sells unlimited sizes. Even SMART SIZE, from which the claimed SIZES mark is not directly derived, indicates to the potential consumer that a product characterized by its size is being offered.

It is thus clear that "Sizes" is not being used, first and foremost, to indicate the fact that the stores generally sell clothing or to indicate that the clothing is oversized, as opposed to any other size. Rather, SIZES is used in the most direct and unimaginative fashion possible, to indicate "up front" the most important specific marketing feature of the apparel offered—their size. In this respect, the present case is similar to *Bristol– Myers* and *Thompson Medical*—like the marks P.M. and SPORTSCREME, SIZES does not indicate all the precise properties of the particular product at issue, but rather immediately alerts the potential customer to what its sponsor deems the most important feature of the product at issue.

Finally, that "sizes" is a generic term, which is used in the fashion and retail industry to describe the dimensions of a garment, weighs in favor of the marks' categorization as descriptive rather than suggestive. *See Bernard v. Commerce Drug,* 964 F.2d at 1342. *Cf. Western Publishing Co.,* 910 F.2d

57, 61 (origin-indicating characteristics of mark "golden" were undercut by common and wide-spread usage of word in various permutations, demonstrated by numerous trademark registrations in industry).

Plaintiffs argue, however, that its use of SIZES must be understood to be a suggestive rather than descriptive because the word "sizes," is not "large-sizes" or "plus sizes," which describe large-size women's clothing, and that the product being sold is not a size. This argument has some appeal. Its flaw, however, is it's failure to take into account that the word SIZES in context refers directly and without need for insight to the only specific characteristic that distinguishes the merchandise at issue, namely, their size. As such, its use is not primarily figurative or unclear in any manner.

Moreover, that there also exists the useful adjectives "plus size" and "large size," used to refer to women's clothes sizes 14 and up, does not affect the fact that the word "Sizes," when used to indicate a product whose distinguishing feature is its size, is not a significantly imaginative or suggestive use of the term. Finally, that SIZES may be something of a neologism as used by plaintiffs does not change this analysis, or make SIZES any less descriptive. It is not linguistic invention that controls the characterization of a mark. Instead, it is the choice by the user of a descriptive rather than suggestive, imaginative or arbitrary term. *Bernhard v. Commerce Drug Co.,* 964 F.2d 1338 (ARTHRITICARE was descriptive mark, despite new coinage, because, although term did not describe specific nature of the goods, it does describe the general use to which the product is put); *James Heddon's Sons v. Millsite Steel & Wire Works,* 35 F.Supp. 169 (E.D.Mich.1940), *aff'd,* 128 F.2d 6 (6th Cir. 1942), *cert. denied,* 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541 (1942) (mark BASSER for fish lure was descriptive of product although "you may not find the word 'Basser' in the dictionary").

In the context of its use, it becomes evident that the mark SIZES is not figurative or imaginative. It requires no imaginative exertion to understand that a store called SIZES offers sizes. As such, plaintiffs use of

the mark SIZES should not be protectable without proof that the mark has developed secondary meaning in the relevant market.

 "To establish secondary meaning it must be shown that the primary significance of the term in the minds of the consuming public is not the product but the producer." *20th Century Wear v. Sanmark–Stardust Inc.*, 815 F.2d 8, 10 (2nd Cir.1987). In determining whether a mark has acquired secondary meaning, such factors as advertising expenditures, consumer studies linking the name to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and length and exclusivity of the mark's use are relevant, but no single factor is determinative. *Thompson Medical,* 753 F.2d at 217. In this regard, plaintiffs have not submitted persuasive evidence that when members of the relevant consuming public see the word "Sizes," by itself, or placed at the beginning of a business name, its primary significance is that the goods originate from a single source.

### Promotion and Sales

To begin with, plaintiffs' promotional practices do not support a finding of secondary meaning. Plaintiffs spend, nationally, approximately a total of a million dollars each year for advertising and promotion of all three of the chains of stores at issue, consisting of about two hundred and fifty stores. They do not, however, generally advertise through media such as television, radio or print media, but rather through such means as direct mail, in-store promotions, and leaflet distribution. More significantly, plaintiffs have made no showing that these promotional expenditures generally feature or focus on plaintiffs' SIZES mark. Even the signs on plaintiffs' stores do not demonstrate any focus on a single SIZES mark. Plaintiffs' various stores and chains of stores all have different signs, using different lettering and

coloring for the word "Sizes" (perhaps reflecting the fact that their ownership was, until relatively recently, distinct from each other).[2]

Plaintiffs' other efforts to promote its umbrella SIZES mark are also insufficient to establish secondary meaning. Since about 1985, plaintiffs have offered their customers a credit card called "Sizes Gold," which is now held by approximately 250,000 individuals nationwide. Plaintiffs apparently have used the SIZES name on some promotional materials, including such things as gift certificates, and has used it on some packaging, such as shopping bags, as well as on a rubber stamp used for layaway goods. Plaintiffs also instruct the employees in their stores to answer the telephone with a greeting followed by the identification of the store as "Sizes."

Moreover, while the success of the stores at issue, with over $8,000,000 average gross sales yearly in Brooklyn, could support a finding of secondary meaning, on the present record the success of plaintiffs' Brooklyn stores has not been shown to be associated in any manner to the existence or promotion of the SIZES mark. In sum, the evidence relating to advertising, promotion and sales all demonstrates that plaintiffs did not deploy the SIZES mark, or the three marks from which it derives, in such a manner as would support a finding of secondary meaning in the word SIZES.

### Consumer Recognition and Trade Usage

Plaintiffs have also submitted little evidence demonstrating that a potential customer would link the products or services offered at any or all of plaintiffs different named stores together under a SIZES rubric. The testimony of Donald McFarrell, a long-time Brooklyn store manager for the plaintiffs, in which he vouched for customer use of the mark does not lead to any different finding.

**2.** Prior to 1983, when they were acquired by plaintiffs' predecessor corporation, "the Limited," "Smart Size" was owned by Lane Bryant, another large-size woman's clothing retailer unrelated to plaintiffs, and Sizes Unlimited was a division of Roaman's (also, apparently, unrelated to plaintiffs). The Limited, which later was acquired by and merged into plaintiff United Retail Group in 1989, opened the Sizes Woman stores

beginning in 1987. Thus, the earliest date at which plaintiffs were operating the companies it now refers to as the "Sizes" stores was 1987. Prior to that date, the fact that plaintiffs' predecessor owned two chains of stores with a variant of the word "Size" in their names appears to have been fortuitous, and attributable primarily to the descriptive characteristics of the mark.

Such testimony alone "by a proprietor is considered self-serving and of little probative value." *815 Tonawanda Street Corp. v. Fay's Drug Co., Inc.,* 842 F.2d 643, 648 (2d Cir.1988). Similarly, the customer correspondence offered by plaintiffs in this regard, while evidencing some recognition of the SIZES mark by existing customers, is too insubstantial to support a conclusion that the mark was recognized by the potential customer in the public at large.

Plaintiffs' study addressed primarily to the issue of likelihood of confusion, prepared under the guidance of Norman Passman (the "Passman Study") likewise provides little support for the conclusion that plaintiffs SIZES mark, or the marks from which it derives as a group, have some consumer recognition. In that study, plaintiffs' researcher showed a carefully screened group of woman shoppers either a photo of Sizes to Fit, and a second group photographs of Shaz, another large-size women's clothing store located in the Fulton Mall. Plaintiffs asked each subject, first, without suggesting an answer to the question, whether the store at issue was affiliated with any other store. In the group that was shown Sizes to Fit, 21.6% of the respondents said it was affiliated, and for the group that was shown Shaz 18% said it was affiliated. Not only did 78% of those shown pictures of Sizes to Fit fail to indicate an awareness of an affiliation with any other store, but less than half of those who did named a store owned by plaintiffs with "Size" or "Sizes" in the name. This is an insignificant number, given the similarity of name and product between plaintiffs' three stores and defendant's store which are all located in the same section of Brooklyn.[3]

While a more compelling showing could support a finding of secondary meaning, in the absence of some greater evidence of awareness of plaintiffs' claimed marks, or of evidence connecting this awareness with the umbrella SIZES mark, or showing consumer awareness of plaintiffs' businesses as associated with each other, the survey does not support a finding of secondary meaning in SIZES alone or as used in plaintiffs' store names.

Finally, while there has been some limited usage in the trade and in the trade press of SIZES, those references predominantly reflect the plaintiffs' own way of describing and referring to the stores, appear confined to the industry, and are in no sense sufficiently pervasive or uniform as to demonstrate secondary meaning.

**Length and Exclusivity of Use**

This factor is equivocal. At the time defendant opened Sizes to Fit in 1992, there were no stores other than stores owned by plaintiffs in Brooklyn using the words Size or Sizes in the name which sold large-size women's clothing. However, there were a number of businesses nationwide and locally using the word "Size" or some permutation of it in their name in much the same manner as plaintiffs—to indicate a product distinguished by its size. Among the existing businesses were a chain called "PS Sizes Plus Savings," a store called "Sizes Plus" in Wallingford Connecticut, a store called "Size Plus Corner" in Nassau County, and an out of state men's clothing chain called "Sizes Unlimited." There also existed at the relevant time another store called "Size More Casuals."

In short, while there were numerous businesses in the same general market using the word SIZES or some version of it in their name, those businesses were not necessarily known to the potential consumer, and thus their existence does not weigh significantly on the issue of whether SIZES has developed secondary meaning.

**Intent to Plagiarize**

Plaintiffs have attempted to present evidence that defendant knew about plaintiff's marks and intentionally copied them in order to support its claim that the mark must be

---

3. Although twenty responses named a store owned by plaintiffs with "Size" or "Sizes" in the name, twenty-five responses named a store not owned by the plaintiffs or without "Size" or "Sizes" in the name, and eight individuals could not identify or name any store affiliated with the defendant. With respect to the 40 respondents who said Shaz was affiliated, 8 responses indicated a store owned by defendants with "Size" or "Sizes" in the name, 23 named another store, and 17 individuals could not identify the store with which Shaz was affiliated.

deemed entitled to protection.[4] They offered evidence showing, *inter alia,* that plaintiffs' stores are located near defendant's address on the Fulton Mall in Brooklyn, plaintiffs' store closest to defendant being a SIZES UNLIMITED store several blocks away on a side street on Hanover Place, off the Mall. Plaintiffs also offered evidence tending to show that the plaintiffs and the defendant are in direct competition, with similar low price points and some overlapping merchandise, although defendant's pricing tends to be lower than plaintiffs'.

At the hearing on the permanent injunction, plaintiffs also elicited additional evidence relating to Shaya Hazan's involvement in the founding and management of Sizes to Fit, which is owned by Shaya's brother, Gabi Hazan. Notably, plaintiffs elicited additional evidence that Shaya Hazan, Gabi's brother, had far more extensive experience in the clothing business than Gabi, and assisted Gabi, as well as others, in opening and merchandizing clothing stores.

While Gabi found the site for the Sizes to Fit store, Shaya negotiated the lease, and Shaya's employees acted as buyers for Gabi's store. Gabi is an officer of Sizes to Fit, Inc., and has signatory power over the store's bank account. Shaya's attorney did the legal work for the opening of Sizes to Fit, but no trademark search was done on the name. Shaya stated that he was aware that there were stores selling women's large-size clothing called SIZES UNLIMITED and SMART SIZE. He did not testify whether he knew if they were related, or if he had ever heard the SIZES name used to refer to any of those stores. Shaya also testified that he had heard of another store with a name something like "P.S. Sizes," located on Long Island. Gabi, who claims to have come up with the name at issue, did testify that he spent many months looking for a store location, before finding the present space occupied by Sizes to Fit. Plaintiffs also elicited evidence that defendant's original signs, which have since been replaced, had somewhat similar lettering to plaintiffs' signs on

their nearby Sizes Unlimited store. Apparently, no trademark search was performed for "Sizes to Fit" prior to the opening of defendant's store.

This evidence, however, does not necessarily support a finding that defendant improperly intended to plagiarize plaintiffs SIZES mark and obtain its goodwill for itself, or that the mark had secondary meaning. While the evidence arguably supports a finding that one or both of defendant's principals were aware of the existence of plaintiffs' stores, the evidence here also supports the conclusion that, far from taking the mark in bad faith, the Hazans believed "Sizes" was a common word in the retail fashion industry, and available for its descriptive qualities.

Thus, defendant's awareness of some of plaintiffs' store names, in the absence of some greater indication of recognition of the mark at issue in the minds of the consuming public (or of the Hazans) than is present in this case, does not support a finding of bad faith or of secondary meaning. *See Bristol–Myers,* 973 F.2d at 1042 ("Although imitative intent can help support a finding of secondary meaning, ... it does not necessarily mandate one ..."). On the contrary, defendant's use of the word "Sizes," in its ordinary descriptive sense on its own store, indicates a lack of inventiveness and a desire to telegraph the nature of the goods sold to the public, traits shared with the plaintiffs here, and not the existence of secondary meaning in the word "Sizes."

Such descriptive use of a term amounts to fair use of that term. As explained by Judge Leval:

> [W]hen the plaintiff chooses a mark with descriptive qualities, the fair use doctrine recognizes that he cannot altogether exclude some kinds of competing uses, particularly those which use words in their primary descriptive and non-trademark sense.

*United States Shoe Corp. v. Brown Group, Inc.,* 740 F.Supp. 196, 198 (S.D.N.Y.1990), *aff'd,* 923 F.2d 844 (2d Cir.1990). *Cf.*

---

4. Plaintiffs raise this argument primarily in the context of its likelihood of confusion argument, but it is relevant also to the determination of whether a mark has secondary meaning. *See Bristol–Myers,* 973 F.2d at 1042.

*W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir.1993) (good faith choice of mark may be found where a defendant has selected a mark which reflects the product's characteristics).

The present case is significantly different from *Toys 'R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189 (E.D.N.Y.1983) on which plaintiffs seek to rely in this regard. In that case, defendants opened a virtually identically named store to Toys' R 'Us (called "Kids 'R' Us") near a Toys 'R' Us location, and argued that they were completely unaware of the existence of that heavily advertised and promoted chain. Not surprisingly, Judge Glasser found the defendants' claim incredible. By contrast, however, here, defendant's principals do not claim lack of awareness of the existence of plaintiffs' stores, but, instead, lack of awareness of their connection to a single source. On the record here, that testimony is credible. Accordingly, the evidence does not give rise to the inference of an intent on the part of defendant to obtain the plaintiffs' goodwill and name recognition in the word SIZES, to the extent they exist.

### State Law Unfair Competition

▮ Plaintiffs also seek relief under state-law principles of unfair competition, New York G.B.L. § 349 and G.B.L. § 368. Under the common law, a cause of action will lie, regardless of secondary meaning, if a party makes a showing of "bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Rosenfeld v. W.B. Saunders, a Division of Harcourt Brace Jovanovich, Inc.*, 728 F.Supp. 236, 249–50 (S.D.N.Y.), *aff'd*, 923 F.2d 845 (2d Cir.1990). Similarly, a claim under G.B.L. § 349(a) requires a showing of "deliberate and deceptive" practices.

▮ The problem with these claims in the present context is that plaintiffs have not sufficiently demonstrated that defendant acted with bad faith, predatory intent, or even awareness of one entity's claim to exclusive rights in the word "Sizes." As a result, causes of action based on a claim of bad faith choice of the descriptive SIZES TO FIT mark will not lie. Moreover, to establish a claim for injury to business reputation or dilution, a party must show that it possesses a distinctive trademark, and likelihood of dilution of the value of that mark by another's use of its mark. *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621 (2d Cir.1983). Plaintiffs have not established that they have a distinctive mark in SIZES. Accordingly, relief cannot be granted on this basis.

### Conclusion

Plaintiffs have not shown that their unregistered SIZES mark is sufficiently distinctive to merit protection under the Lanham Act, or that defendant's actions constitute a violation of the state law of unfair competition. Accordingly, plaintiffs' motion for injunctive relief is denied and the complaint is dismissed. The foregoing constitutes the findings of fact and conclusions of law. If either party desires a specific finding not incorporated here, it may make a supplemental motion seeking such relief.

SO ORDERED.