The **BLACK & DECKER CORPORATION** and Black & Decker (U.S.) Inc., Plaintiffs,

v.

Michael **DUNSFORD** and M.D. Enterprises, Inc., Defendants.

No. 95 Civ. 1303 (SAS).

United States District Court, S.D. New York.

Aug. 6, 1996.

Mark P. Ladner, Morrison & Foerster, New York City, and Raymond P. Niro, Raymond P. Niro, Jr., Christopher J. Lee, Niro, Scavone, Haller & Niro, Chicago, IL, for Plaintiffs.

Donald R. Dinan, O'Connor & Hannan, L.L.P., Washington, DC, and James G. Charles, Charles & Charles, Washington, DC, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs Black & Decker Corporation and Black & Decker (U.S.) Inc. ("Black & Decker" or "plaintiff") have moved for summary judgment on Counts I, II and III of their

Complaint[1] and Counts I, III and IV of Defendants' Counterclaim.[2] Black & Decker seeks summary judgment on the ground that the name "Snakelight" as used by Defendants Michael Dunsford ("Dunsford") and M.D. Enterprises, Inc. ("M.D.") is not protectible as a matter of law. Because Defendants' mark is a descriptive mark without secondary meaning, the motion is granted.

I. *Factual Background*

In July 1989, Dunsford developed a flexible lighting apparatus to highlight the art to be shown in an upcoming exhibition at his furniture store/art gallery in San Diego, California. He named the fixture "Snakelight."[3] Defendants' Amended Answer and Counterclaim ("Am. Answer") at 7. Because the lighting devices received almost as much attention as the art at the exhibition, Dunsford began to manufacture more of the lights and offer them for sale through his business. *Id.* The first retail sale of Dunsford's "Snakelight" product occurred on July 8, 1989, in San Diego. *Id.,* Ex. B. Dunsford manufactured and sold his products on a part-time basis for the next several years. Deposition of Michael Dunsford ("Dunsford Dep."), September 20, 1995, at 105. After three and a half years of producing "Snakelights," Dunsford had earned sales revenues of approximately $47,000. Affidavit of John F. Delaney, Attorney for Plaintiffs ("Delaney Aff."), Ex. 5 at 4.

During roughly the same time period, Black & Decker began to develop a new household flashlight which, because of its flexible handle, could be used "hands-free" by coiling or bending the handle, or wrapping it around a fixed object. Dinan Aff., Ex. 19. In November 1992, Black & Decker hired two law firms to conduct a trademark search for the name "SnakeLite." Complaint ("Cplt."), Exs. G and H. Searches were made of federal registrations, state trademarks, business and trademark directories and foreign registrations and directories. Cplt. ¶ 29. No reference was found to any prior use of the name, and Black & Decker was advised that the mark was available for use and registration. *Id.*

Black & Decker also conducted searches for the names "FlexLite" and "FlexLight." Dinan Aff., Ex. 20. However, the name "SnakeLite" was favored by David R. Stone, president of Black & Decker's household products division. Deposition of David R. Stone, January 12, 1996, at 14, 17–18, 29. As a result, Black & Decker applied for a trademark registration in the United States Patent and Trademark Office ("the PTO") on December 8, 1992, based on its intent to use the name "SnakeLite." Cplt. Ex. I. The application was published for opposition on April 27, 1993 and formally approved by the PTO on July 20, 1993. *Id.,* Ex. J. More than a year later, on August 26, 1994, Black & Decker filed its Statement of Use, requesting registration of the mark "SnakeLight,"

1. Black & Decker brought this action seeking a declaration of its rights in its registered trademark "SnakeLight," the name of Black & Decker's well-known portable, battery-operated, flexible flashlight. The Complaint contains seven counts. Count I seeks a declaration that Black & Decker has not unfairly competed with Dunsford, created any likelihood of confusion as to the origin of its products, or otherwise violated § 43(a) of the Lanham Act. Plaintiff also seeks a declaration that it did not willfully or in bad faith adopt or infringe any trademark rights of Dunsford (Count II), and that Dunsford has no right to injunctive relief (Count III). Count IV seeks a declaration that Defendants have no claim for common law unfair competition under New York law. Count V seeks a declaration that Dunsford has no right to seek cancellation of Black & Decker's trademark registrations. Black & Decker also seeks a declaratory judgment in Count VI that it did not infringe or engage in

deceptive trade practices under New York General Business Law §§ 349 and 368–b, and that Plaintiff has not injured Dunsford's business reputation, or diluted Dunsford's "Snakelight" name under New York General Business Law § 368–d (Count VII).

2. Defendants' Amended Answer and Counterclaim contains claims for common law trademark infringement (Count I), unfair competition (Count II), violation of § 43(a) of the Lanham Act (Count III), and false registration (Count IV).

3. Dunsford's "Snakelights" are flexible track and canopy-mounted lighting fixtures. The lights can be bent and shaped so that the beam of light focuses in any direction. The lights sell for $54.50 to $124.50 per unit, and are available by mail order. Affidavit of Donald R. Dinan, Attorney for Defendants, ("Dinan Aff."), Ex. 16.

rather than the phonetic equivalent "Snake-Lite." *Id.*, Ex. K.

After investing more than $4 million to develop the flexible flashlight, Black & Decker introduced its SnakeLight to the public in the summer of 1994.[4] *Id.* ¶ 14. The product was extremely successful from the start. An article in the December 22, 1994 edition of *USA Today* called the flashlight "perhaps the biggest hit of the holiday season." *Id.* Ex. E. Black & Decker's SnakeLight was selected by *Popular Science* magazine as one of 1994's 100 greatest achievements in science and technology. Cplt., Ex. B. It was also selected by *Popular Mechanics* for a 1995 design and engineering award. *Id.*, Ex. C. Black & Decker spent over $2 million advertising the SnakeLight during the first seven months after the product's introduction, and planned to spend $10 million for advertising in 1995.[5] *Id.* ¶ 21.

Defendants first learned of Black & Decker's product in November 1994. Am. Answer, ¶ 20. By this time, Dunsford had achieved a total of $80,000 in gross sales of his "Snakelight" product, which he had begun manufacturing in 1989. Dunsford Dep. at 20. Prior to October 1994, Defendants had spent no money for advertising. *Id.* at 48. Between October 1994 and April 1995, Dunsford spent approximately $3,000 on advertising. Delaney Aff., Ex. 17. Since the introduction of Black & Decker's SnakeLight flashlight, Dunsford's Snakelight business has "greatly improved." Dunsford Dep. at 107.

Nevertheless, on February 7, 1995, Black & Decker received a letter from Defendants' counsel, stating his belief that Black & Decker's use of the name "SnakeLight" was an infringement of Dunsford's rights. Cplt., Ex. A. The letter stated that Dunsford intended to file a cancellation of Black & Decker's mark, to file an application with the PTO to register Dunsford's mark, and to file suit seeking equitable and monetary relief from Black & Decker. *Id.* at 2. Believing it was about to be sued, Black & Decker filed this action on February 23, 1995, seeking a declaration of its rights in its registered trademark "SnakeLight."

## II. *Procedural History*

After this lawsuit was filed on February 23, 1995, Dunsford filed suit against Black & Decker on March 3, 1995 in the U.S. District Court for the District of Maryland. Two weeks later, on March 20, 1995, Dunsford moved to dismiss this lawsuit for lack of personal jurisdiction, for improper venue, and for forum non conveniens. On May 4, 1995, the parties agreed that in order to conserve resources, their dispute would proceed in this forum only. Consequently, Dunsford filed a Notice of Dismissal with the Maryland court, and the Motion to Dismiss this suit was withdrawn on August 2, 1995.

Meanwhile, Dunsford filed an Answer and Counterclaim on May 25, 1995. Defendant M.D. Enterprises, Inc., a corporation formed by Dunsford and wholly owned by him, was allowed to intervene pursuant to an order dated December 21, 1995. Black & Decker moved for summary judgment on March 7, 1996.

On March 13, 1996, Defendants were granted leave to amend their Answer and Counterclaim. The Amended Answer was filed on April 1, 1996, followed by Black & Decker's reply on April 17, 1996. Pursuant to a June 25, 1996, telephone conference, both parties were ordered to submit supplemental briefs on the issue of judicial admissions made by Dunsford and his attorneys in his Maryland Complaint and in the original Answer in this action. The parties submitted the supplemental briefs on July 2, 1996. In addition, pursuant to a telephone conference on July 16, the parties were asked to submit supplemental briefs on the issue of secondary meaning by July 25, 1996. All briefs have now been submitted.

---

4. Black & Decker's flashlight is sold through national retail chains such as Wal–Mart, Home Depot, and K–Mart, and retails for $24 to $30 per unit. Cplt. ¶ 23.

5. As of December 4, 1995, Black & Decker had sold over four million SnakeLight flashlights in the United States alone. At roughly $25 per unit, gross sales totalled approximately $100 million. Delaney Aff., Ex. 12, ¶ 3.

III. *Legal Standard for Summary Judgment*

Summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden of demonstrating that no factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

The movant's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. Once this burden is met, the nonmoving party must "go beyond the pleadings," by pointing out factual evidence showing that there are, in fact, genuine issues for trial. *Id.* at 324, 106 S.Ct. at 2553. Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. The nonmoving party may not simply rely upon unsupported denials or allegations. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

For purposes of summary judgment, the court's role is to determine whether issues exist to be tried, not to try issues of fact. *See Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). The court must review the evidence in the light most favorable to the nonmoving party, and draw all factual inferences in that party's favor. *See Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). Summary judgment is improper if there is any evidence in the record from which a fair inference may be drawn on a material issue of fact in favor of the party opposing summary judgment. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). A factual issue is material if its resolution could affect the outcome of the dispute. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Summary judgment may be granted when no reasonable trier of fact could find in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

IV. *Analysis*

A. *Lanham Act Claims*

1. *Protectibility of the Mark*

Black & Decker seeks a declaration in Count I of its Complaint that it has not violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Because Count I of Black & Decker's Complaint corresponds to Count III of Defendants' Counterclaim, both will be analyzed together.

As an initial matter, in order to prevail on a claim of trademark infringement under § 43(a) of the Lanham Act, the party claiming ownership of a mark must show that the mark is entitled to protection. *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 213 (2d Cir.1985); *see also Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). In this case, Dunsford and M.D. bear the burden of showing that the name "Snakelight" as applied to their product is protectible.

In order to determine protectibility, it is first necessary to classify the type of mark. In ascending order of protectibility, marks may be (1) generic, (2) descriptive, (3) suggestive or (4) arbitrary or fanciful. *Id.* Under the law in this Circuit, a mark is protectible if it is inherently distinctive, that is, if the mark is either suggestive or arbitrary/fanciful. *Id.* at 11. In addition, a mark which is merely descriptive may become distinctive, and hence protectible, by acquiring secondary meaning. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992) ("[t]he general rule regarding distinctiveness

is clear: An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning") (citations omitted) (emphasis in original).

## 2. *Categorizing the Mark*

"The first prong of the test for infringement requires the court to determine which category of trademark the ... mark belongs to, in order to ascertain the level of protection afforded it." *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F.Supp. 30, 43 (E.D.N.Y.1994); *see also Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039–40 (2d Cir.1992) ("[T]he initial classification of a mark to determine its eligibility for protection is a question of fact left to the determination of the district court."); *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 582 (2d Cir.1990) ("The starting point of our examination is to determine whether a mark is eligible for protection."); *Thompson Medical*, 753 F.2d at 216 (district judge's failure to classify mark did not prevent appellate court from making that determination); *Expocon-sul Int'l, Inc. v. A/E Systems, Inc.*, 755 F.Supp. 1237, 1240 (S.D.N.Y.1991) (summary judgment proper where party demonstrates "in a manner that leaves no issue for trial" that mark is not entitled to protection).

■ Compounding the difficulty of categorization is that a mark's classification may differ depending on the nature of the product. For example, "the word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used on apples." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 11.22 (3d ed. 1996).

To assist with the proper classification of trademarks, the Second Circuit has defined the categories as follows:

A generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use "imagination, thought, and perception to reach a conclusion as to the nature of the goods...." Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning....

*W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993) (quoting *Thompson Medical*, 753 F.2d at 213 (quoting *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y. 1968)).

■ Using these guidelines, I find that Plaintiff has demonstrated that Dunsford's "Snakelight" mark is descriptive. "Snakelight" is just what it says: a "snake-like" light. In this context, the word "snake" functions as an adjective, modifying the principal term, the generic noun "light." Taken as a whole,[6] the name conveys the "immediate idea" of the "characteristics" of the product. *Abercrombie & Fitch*, 537 F.2d at 11. The light is flexible, and can be bent or twisted to focus its light in any direction. A consumer does not need to use "imagination, thought, and perception" to reach a conclusion as to the nature of a "Snakelight," because the term employed describes the product. The consumer need not engage in a multi-step reasoning process to associate the name "Snakelight" with a light fixture which can be bent or coiled. *See Bristol–Myers*, 973 F.2d at 1040.[7]

---

6. "The commercial value of a trademark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety." *Estate of P.D. Beckwith's, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 417, 64 L.Ed. 705 (1920).

7. Black & Decker argues that Defendants' mark is descriptive because of Dunsford's so-called judicial admissions of descriptiveness in the Maryland Complaint and in the original Answer and Counterclaim in this action. *See* Pl.Ex. 1, Maryland Complaint ¶ 37; Ex. 2, Original Answer ¶ 17. However, the alleged admissions, in the context of the remainder of the pleadings, do not constitute binding admissions that the mark is

There is no dispute between the parties with respect to the facts which must be considered in determining the mark's classification. The quarrel is over the conclusion which should be drawn from those undisputed facts. Based upon this record, I conclude that Dunsford's mark is descriptive. Defendants have failed to identify a disputed issue of fact requiring a trial. *See* discussion at part III, *supra*.

### 3. *Secondary Meaning*

Having determined that the term "Snakelight" as applied to Defendants' product is descriptive, I turn now to the second part of the protectibility inquiry—whether the name has acquired secondary meaning. In order to avoid summary judgment, Defendants must show that the pertinent class of consumers, upon hearing the term "Snakelight," immediately associates the term with Dunsford and/or M.D. Enterprises.

#### a. *Standard*

■ Secondary meaning occurs when the consumer immediately associates the name of a product with its source. *See National Color Labs., Inc. v. Philip's Foto Co.*, 273 F.Supp. 1002, 1003 (S.D.N.Y.1967) (secondary meaning "suggests the company to the public at the very mention of the trade name"); *Field Enters. Educ. Corp. v. Cove Indus., Inc.*, 297 F.Supp. 989, 994 (E.D.N.Y. 1969) (secondary meaning attaches only when "the public has learned to identify the name of the product with its source"). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the *primary* significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72

L.Ed.2d 606 (1982) (citation omitted) (emphasis in original).

■ Because the legal consequences of classification are so important to a claim under Section 43(a) of the Lanham Act, showing secondary meaning "entails vigorous evidentiary requirements." *Thompson Medical*, 753 F.2d at 217 (citation omitted). Moreover, "[s]econdary meaning for a descriptive term is a matter of fact, to be determined from relevant evidence probative of probable customer reaction." McCarthy, *supra*, § 11.09.

■ The existence of secondary meaning can be determined by assessing the attitude of the consuming public [8] toward the product, using such tools as consumer studies and surveys, sales success, advertising expenditures, and the length and exclusivity of the mark's use. *Thompson Medical*, 753 F.2d at 217. Further, "no single factor is determinative" in a secondary meaning analysis. *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Thus, each case "must be resolved by reference to the relevant factual calculus." *Thompson Medical*, 753 F.2d at 217. "The fundamental question … is whether 'the *primary* significance of the term in the minds of the consuming public is not the product but the producer.'" *Bristol–Myers*, 973 F.2d at 1041 (citation omitted) (emphasis in original) (quoting *Centaur Communications, Ltd. v. A/S/M Communications*, 830 F.2d 1217, 1221 (2d Cir. 1987).

#### b. *Application of Standard*

■ Based upon the submissions made to the Court for purposes of this motion, and

---

descriptive. Likewise, Dunsford's deposition statement that his product has the appearance of a snake does not constitute a judicial admission of descriptiveness. Instead, Dunsford's statement merely corroborates the conclusion made above, that the name "Snakelight" as applied to Defendants' product is descriptive—possessing the attributes, appearance and characteristics of a snake.

**8.** The consuming public consists of the "particular market" to which the product is directed.

*Bristol–Myers*, 973 F.2d at 1040. Defendants argue that the group of relevant consumers consists of "a close knit network of interior designers, architects, artists, home decorators, etc." Defendants' Supplemental Submission on Secondary Meaning at 1. Obviously the relevant group cannot be limited to purchasers of the product, nor can it include the public at large. For purposes of this motion, the relevant consumer group is all interior designers, architects, artists, home decorators, etc. *See* Cplt. ¶¶ 17, 23.

using the factors outlined above, it is apparent that no reasonable jury could find that Defendants have achieved secondary meaning in the term "Snakelight."

First, Defendants have not submitted any consumer studies or surveys [9] which might tend to show either the presence of secondary meaning, or at the very least that a genuine, triable issue exists as to secondary meaning in the name "Snakelight." Though Defendants argue that they have in fact attained secondary meaning, they offer no proof to support that assertion. In a summary judgment analysis, the nonmoving party may not defeat the motion by resting upon unsupported allegations or denials. *See Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514.

Defendants have offered scant proof of the other *Thompson* factors, namely sales volume, advertising expenditures, and the length and exclusivity of the mark's use. These factors are relevant because they tend to evidence the consuming public's attitude toward the product. *See Co–Rect Prods.*, 780 F.2d at 1332–33. In this case, Dunsford's sales after more than five years of production had only reached $80,000—less than $16,000 per year. Dunsford Dep. at 20; Pl.Ex. 5 at 3. Defendants have cited no case where any court has held that secondary meaning can be established based on such minimal commercial activity. In fact, the cases hold to the contrary.[10]

Additionally, Defendants had not spent any money on advertising their product prior to October 1994. Dunsford Dep. at 48. After becoming aware of Black & Decker's product, Defendants spent approximately $3,000 on advertising between October 1994 and April 1995. Delaney Aff., Ex. 17. These advertising dollars were spent entirely on print advertisements in *Metropolis* magazine, a publication which has a readership of approximately 100,000. Dinan Aff., Ex. 11. Given the "vigorous evidentiary requirements" which must be met in order to show secondary meaning,[11] *Thompson Medical*, 753 F.2d at 217, no reasonable jury could find that Defendants' advertising expenditures have contributed to the attainment of secondary meaning. Further, Defendants have failed to raise any factual dispute regarding their advertising expenditures.

Finally, there is no factual dispute regarding the length and exclusivity of Defendants' use of the "Snakelight" name. The critical question is whether Dunsford's mark had achieved secondary meaning prior to the time Black & Decker commenced use of the mark. *See PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir.1990). Dunsford's first sale of a "Snakelight" occurred in July 1989. Am.Answer, Ex. B. Black & Decker first applied for a trademark registration for the name "SnakeLite" in December 1992. Cplt.Ex. I. The first "Snake-Light" flashlight was sold in August 1994. Cplt. ¶ 14. Dunsford's exclusive use of the "Snakelight" name, therefore, lasted either three and a half years (terminating in December 1992)[12] or five years and a month

---

9. Consumer surveys are "the most direct and persuasive evidence of secondary meaning." *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1333 n. 9 (8th Cir. 1985).

10. *See, e.g., Arrow Fastener Co. v. Stanley Works*, 870 F.Supp. 427, 428 (D.Conn.1994), *rev'd on other grounds*, 59 F.3d 384 (2d Cir.1995) (40,-000,000 staplers and over 500,000,000 boxes of staples sold led to finding of secondary meaning); *Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1339 (2d Cir.1992) (summary judgment proper for failure to establish secondary meaning where 20,000 offers for free samples were sent out and 8,000 people responded); *Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 n. 1 (2d Cir.1981) (20 million Harlequin Presents books sold in U.S. in 1979 led to finding of secondary meaning); *Sunrise Home Juices, Inc. v. Coca–Cola Co.*, 220 F.Supp. 558, 559, 561 (S.D.N.Y.1963) ("comparatively limited sales" of $30,000 in 1952 to $600,000 in 1963 insufficient to show secondary meaning); *Roselux Chemical Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 862 (C.C.P.A.1962) ($3 million in sales in one year insufficient to show secondary meaning). Defendants do not come close to meeting the substantial level of sales volume required for a showing of secondary meaning.

11. *See, e.g., Roselux*, 299 F.2d at 861–62 ($1 million in advertising insufficient to show secondary meaning).

12. Black & Decker's constructive use of the mark began when it filed for registration with the PTO on December 8, 1992. Constructive use has the "same legal effect as the earliest actual use of a trademark at common law." McCarthy, *supra*, § 16.05[2].

(terminating with the introduction of Black & Decker's "SnakeLight" in August 1994). Under either calculation, however, the length and exclusivity of Defendants' use of the mark is insufficient to show that secondary meaning had been established before Black & Decker began its use of the mark.

Other evidence which weighs in favor of summary judgment includes Dunsford's failure to file any federal or state trademark applications on his mark prior to 1995, and his failure to use the "™" symbol in connection with the "Snakelight" name prior to 1995. Plaintiff's 3(g) Statement ¶¶ 47–50. Further, prior to 1995, Dunsford never placed any label or other indication on his product identifying the name or source of the product. *Id.* ¶ 31.

In sum, Defendants have not shown that the consuming public recognizes that Dunsford's "Snakelight" emanates from a single source. There is no showing that in the minds of consumers, "the *primary* significance of [the] term is to identify the source of the product rather than the product itself." *Inwood Labs.,* 456 U.S. at 851 n. 11, 102 S.Ct. at 2187 n. 11 (emphasis in original). Because Defendants have not shown that their term "Snakelight" has attained secondary meaning, the mark is not protectible as a matter of law. Summary judgment is granted in favor of Black & Decker as to Count I of its Complaint and Count III of Defendants' Counterclaim.

### B. *Other Claims*

Having determined that Defendants' name "Snakelight" is not protectible as a matter of law, summary judgment must also be granted as to Counts II and III of Black & Decker's Complaint and Counts I and IV of Defendants' Counterclaim.

Count I of Defendants' Counterclaim alleges common law trademark infringement. In order to prevail on this claim, Defendants must show that the mark which allegedly has been infringed is a legally protectible trademark. *See Pirone,* 894 F.2d at 582; *Estate of Presley v. Russen,* 513

F.Supp. 1339, 1361–62 (D.N.J.1981) and cases cited therein. The test for protectibility under the common law is essentially the same as the test under Federal law. *Pirone,* 894 F.2d at 582. Therefore, Defendants' name "Snakelight" is not protectible under common law, and there is no basis to assert a claim for common law trademark infringement. Summary judgment is granted in favor of Black & Decker as to Count I of Defendants' Counterclaim.

For the same reason, Black & Decker is entitled to summary judgment on Count II of its Complaint, namely, that it did not act willfully or in bad faith adopt or infringe any trademark rights of Defendants. Because Defendants do not have a protectible mark, Black & Decker could not have infringed it.

Black & Decker is also granted summary judgment on Count III of its Complaint, which seeks a declaration that Defendants have no right to injunctive relief. Because of the determination that Dunsford and M.D. do not have a protectible mark in the name "Snakelight," Defendants have no basis for seeking an injunction.[13]

Finally, Defendants assert in Count IV of their Counterclaim that Black & Decker improperly obtained the registration of its trademark through false statements made to the Patent and Trademark Office. However, in light of the pleadings and affidavits submitted by Black & Decker in support of its motion for summary judgment, Defendants are required to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)). The Defendants may not "rest on [their] allegations to get to a jury without 'any significant probative evidence tending to support the complaint.'" *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Other than a short mention in the Counterclaim itself, there is nothing in the pleadings, depositions or affidavits which point to a genuine triable issue as to any material fact on the issue of false registra-

---

13. Additionally, Dunsford's admission that his business has "greatly improved" since the introduction of Black & Decker's flashlight weighs against a finding of irreparable harm.

tion. Addressing this issue at trial would be pointless. Summary judgment is therefore granted in favor of Black & Decker as to Count IV of Defendants' Counterclaim.

## V. *Conclusion*

Summary judgment is granted in favor of Plaintiff Black & Decker on Counts I, II and III of its Complaint, and Counts I, III and IV of Defendants' Counterclaim.[14]

14. The issues remaining to be tried include: Counts IV (unfair competition), V (cancellation of registration), VI (deceptive trade practice) and VII (dilution and injury to business reputation) of the Complaint, and Count II of Defendants' Counterclaim (unfair competition).